## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **JANET HEATH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 4:19-CV-1856 PLC** |
| | ) | |
| **ANDREW SAUL,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Janet Heath seeks review of the decision of Defendant Social Security Commissioner Andrew Saul, denying her application for Disability Insurance Benefits (DIB) under the Social Security Act. For the reasons set forth below, the Court reverses and remands the Commissioner's decision.

### I.    Background

Plaintiff, who was born in January 1961, filed an application for DIB, alleging disability beginning on May 25, 2014 due to generalized anxiety disorder, panic attacks, depression, and diabetes. (Tr. 90-99, 234-35) The Social Security Administration (SSA) denied Plaintiff's claims, and Plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ), which the SSA granted. (Tr. 100, 126-27)

An ALJ conducted a hearing in November 2016 and issued a decision, dated April 26, 2017, finding that Plaintiff was not disabled. (Tr. 65-89, 101-13) Plaintiff appealed the ALJ's decision to the SSA Appeals Council, arguing that the ALJ erred in failing to consider her primary

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

care physician's opinion regarding the limiting effects of her peripheral neuropathy.  (Tr. 116-17)
The Appeals Council remanded Plaintiff's case to the ALJ to consider the physician's opinion and
"give further consideration to the claimant's maximum residual functional capacity[.]"  (Tr. 117)

The ALJ conducted a second hearing in June 2018.  (Tr. 29-64)  In a decision dated October
23, 2018, the ALJ incorporated her prior decision, reviewed and weighed the primary care
physician's opinion, and again determined that Plaintiff "has not been under a disability, as defined
in the Social Security Act, from May 25, 2014, through the date of this decision[.]"  (Tr. 12-22)
The Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision.  (Tr.
1-5)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the
SSA's final decision.  Sims v. Apfel, 530 U.S. 103, 107 (2000).

## II.    Evidence Before the ALJ[2]

Plaintiff testified that she was fifty-seven years old, lived with her husband and adult son,
and previously worked as a preschool teacher.  (Tr. 34-35, 39)  Plaintiff had a high school
education and had completed two years of college.  (Tr. 37)

When the ALJ asked Plaintiff why she believed she was disabled, Plaintiff explained:

> My anxiety and depression is a major reason.  It interferes with my life
> completely every day.  There are day I don't get out of bed.  There are weeks I
> don't get out of bed.  There are days I may go three or four days without a
> shower.  Sometimes my husband has to make me eat.  There have been
> incidences [sic] where I've been suicidal but have never attempted.

(Tr. 42-43) Plaintiff testified that she had "good days and bad days," but "[o]ut of a week, I would
say five days that I struggle just to get out of bed."  (Tr. 54-55)

---

[2] Because Plaintiff does not challenge the ALJ's determination of her physical residual functional
capacity, the Court limits its discussion to the evidence relating to Plaintiff's mental impairments.

Plaintiff testified that she had been receiving mental health treatment since 1998 and seeing psychiatrist Dr. Chilakamarri since 1999.  (Tr. 52)  Plaintiff explained that her depression worsened in 2014, when "I lost my last job…I was bullied out of my job.  I was accused of something that I didn't do….I lost who I was.  I lost the reason I went to school, and the idea of even going into a classroom just scares me to death."  (Tr. 52)  After Plaintiff lost her job at the preschool, she applied for and was offered a job at a grocery store but "I couldn't go to the orientation, I was too anxious…."  (Tr. 53)

On a typical day, Plaintiff's husband woke her at 5:30 a.m. to take her medicine, and Plaintiff went back to sleep until her husband called her at 9:00 a.m.  (Tr. 55)  About three days a week, Plaintiff felt  "anxious and I don't feel like getting up," and she remained in bed until 11:00 or 11:30 a.m.  (Id.)  Plaintiff stated that, some days, "I might vacuum.  I might load the dishwasher.  I might work on the laundry…."  (Tr. 50)  Plaintiff's husband did most of the laundry and all of the cooking[3], yard work, and grocery shopping but, Plaintiff stated, "[s]ometimes I go with him…."  (Tr. 41-42)   Plaintiff stated, "I[f] I get the bed made, I feel like I've made an accomplishment" because "the depression causes me not to have the energy or the … motivation to do [more]."  (Tr. 50)

During the day, Plaintiff slept, watched television, "read a little bit at a time," and played solitaire on her phone for fifteen to twenty minutes.  (Tr. 45, 54)  Plaintiff  "used to read all the time" and also enjoyed coloring, "but even that anymore, I can't – I don't stay focused on it enough to even mess with it anymore."  (Tr. 54)  Plaintiff stated that she sometimes played solitaire on her phone for fifteen to twenty minutes.  (Id.)  Plaintiff explained that, despite belonging to the same

---

[3] In regard to cooking, Plaintiff explained:  "…I'm just very intimidated by the whole process of – that's an anxiety thing, I just don't – I don't feel comfortable.  I don't have the confidence to do it, so [my husband] does all that."  (Tr. 47)

church since childhood, "I haven't been to church in probably four months" because "I just don't want to be around people." (Tr. 48)  Plaintiff had also missed family functions, such as a Fathers Day celebration, because she "was just too anxious that day." (Tr. 49)  When the ALJ asked Plaintiff about a trip to Florida in 2017, Plaintiff explained that she and her husband traveled by car because she was scared of flying and "we leave at night because mornings are bad for me and I take my night medicine to sleep while we – while he drives to Florida and during the time we're there, there are days I don't leave the condo…." (Tr. 43)

Plaintiff testified that she began receiving transcranial magnetic stimulation (TMS)[4] treatments two weeks earlier because "I was in such a state of depression that [the psychiatrist] was trying to find something that would help me come out of it.  So he suggested the TMS or electronic [sic] shock treatments as an addition to seeing him, because he felt that the drugs weren't doing the job anymore." (Tr. 48)  Plaintiff had already missed five days of TMS treatment because "I've been too anxious to … one of my anxiety issues is leaving the house.  I can go for a week and not leave my house or longer." (Id.)

In regard to Plaintiff's medical records, the Court adopts the facts that Plaintiff set forth in her statement of material facts, as admitted by the Commissioner.  [ECF Nos. 14-1, 17-1]  The Court also adopts the facts contained in the Commissioner's response to Plaintiff's statement of facts with additional material facts because Plaintiff does not dispute them.  [ECF No. 17-1]

---

[4] "TMS uses a magnet to activate the brain as treatment for major depression for patients who do not respond to at least one antidepressant medication in the current episode."  Cindy W. v. Saul, No. 4:18-CV-603 JMB, 2019 WL 4537213, at *4 n.2 (E.D. Mo. Sep. 19, 2019) (citing Brain Stimulation Therapies (National Institute of Mental Health), https://www.nih/gov/.../brain-stimulation-therapies.shmtl).

4

### III.  Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must establish that he or she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted).  At step three, the ALJ considers whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d).

Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  See also 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1).  At step four, the

ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. § 404.1520(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011).  If the claimant can still perform past relevant work, he or she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step.  McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled.  Moore, 572 F.3d at 523.  At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform.  20 C.F.R § 405.1520(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).  If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled.  20 C.F.R. § 404.1520(g).

**IV.    ALJ's Decision**

In a decision dated October 23, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520.  (Tr. 12-22)  The ALJ determined that Plaintiff:  (1) had not engaged in substantial gainful activity since May 25, 2014, the alleged onset date; and (2) had the severe impairment of depression with anxiety and the non-severe impairment of diabetic neuropathy.  (Tr. 15)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

In determining whether Plaintiff's mental impairments were severe or met a Listing, the ALJ completed a psychiatric review technique, assessing Plaintiff's limitations in four broad areas of functioning.  (Tr. 15-16)  The ALJ found that Plaintiff had:  (1) no limitation in understanding, remembering, or applying information; (2) moderate limitation in interacting with others; (3) no

6

limitation in concentrating, persisting, or maintaining pace; and (4) no limitation in adaptation and self-management.[5]  (Id.)  In other words, the ALJ concluded, that "the objective facts show [Plaintiff's] social anxiety is the only work-related area of mental function where she has any significant limitations."  (Tr. 20)

Based on her review of Plaintiff's testimony and medical records, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but "her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 18)  In particular, the ALJ noted that the objective evidence and Plaintiff's activities of daily living did not suggest that Plaintiff's impairments were disabling.  (Tr. 18-20)  The ALJ determine that Plaintiff had the RFC to perform medium work "except she is limited to only occasional interaction with the public.  In addition, she is limited to only casual and infrequent interaction with co-workers and she should not be required to engage in tandem tasks, such as assembly line work."[6]  (Tr. 17)

---

[5] In her April 2017 decision, which she "fully incorporated" into the October 2018 decision (See Tr. 19), the ALJ found that Plaintiff had:  (1) mild limitation in understanding, remembering, or applying information; (2) moderate limitation in interacting with others; (3) moderate limitation in concentrating, persisting, or maintaining pace; and (4) mild limitation in adaptation and self-management.  (Tr. 106-07)  The ALJ did not explain the perceived improvement in Plaintiff's mental functioning between April 2017 and October 2018.

[6] Although the Appeals Council remanded the ALJ's April 2017 decision for reconsideration of evidence relating to Plaintiff's physical RFC, the ALJ revised the mental RFC in the October 2018 decision.  The ALJ's earlier decision provided the following RFC:

> Since May 25, 2014, the claimant has been able to perform work at all exertional levels.  She has also been able to perform non-complex, non-detailed tasks involving no direct interaction with the public, casual and infrequent interaction with co-workers involving no tandem tasks, and occasional interaction with supervisors.  The claimant may be absent up to one day per month.

(Tr. 107)

Based on the vocational expert's testimony and answers to interrogatories, the ALJ found that Plaintiff was unable to perform her past relevant work as a preschool teacher and teacher's aide, but she had the RFC to perform other jobs that existed in significant numbers in the national economy.  (Tr. 20)  Specifically, the ALJ found that Plaintiff could perform the jobs of kitchen helper, hand packer, and cleaner.  (Tr. 21)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 22)

## V.   Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ erred in (1) weighing the opinion evidence and (2) formulating an RFC that was not supported by "some medical evidence."  [ECF No. 14]  The Commissioner counters that the ALJ properly weighed the medical opinion evidence and based the mental RFC determination on substantial evidence.  [ECF No. 17]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome."  Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported

8

by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. Medical opinion evidence

Plaintiff argues the ALJ improperly weighed the medical evidence by assigning "minimal weight" to the opinion of Plaintiff's treating psychiatrist, Dr. Chilakamarri. [ECF No. 14] More specifically, Plaintiff argues that Dr. Chilakamarri's opinion was entitled to controlling weight because it was "well-supported by clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record[.]" [Id. at 6] In response, the Commissioner asserts that the ALJ properly discounted Dr. Chilakamarri's opinion because his own findings and statements were inconsistent with the extreme limitations he identified in the MSS. [ECF No. 17]

"Under the relevant regulations,[7] an ALJ must give a treating physician's opinion controlling weight if it is well-supported by medical evidence and not inconsistent with the substantial evidence in the record." Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020). If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the

---

[7] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency. 20 C.F.R. § 404.1520c. Plaintiff filed her applications in 2014, so the previous regulations apply.

following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization.  Id.; 20 C.F.R. § 404.1527(c).

Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation."  Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).  SSA guidance provides that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers … the reasons [for the decision]."  Lucus, 960 F.3d at 1068 (alterations in original) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

While Dr. Chilakamarri began treating Plaintiff in 1999, the earliest treatment notes contained in the record are dated January 2014.[8]  (Tr. 52, 469)  In 2014, Dr. Chilakamarri saw Plaintiff monthly and changed her medications four times.  (Tr. 428, 432, 469, 471-75, 536)  In

---

[8] Dr. Chilakamarri's treatment notes are brief and most of them are handwritten on printed forms and difficult to read.  On the top of the forms, there appeared the following mental status examination:

|                   |   |   |
|-------------------|---|---|
| Alert             | Y | N |
| Oriented X3       | Y | N |
| Speech Clear      | Y | N |
| Suicidal          | Y | N |
| Homicidal         | Y | N |
| Thoughts/Organized | Y | N |
| Groomed/Dress Well | Y | N |

(See, e.g.. Tr. 473) Dr. Chilakamarri consistently circled "no" for suicidal and homicidal and "yes" for all other categories.

September 2014, Plaintiff reported frequent crying, poor sleep, and lack of appetite, and Dr. Chilakamarri referred Plaintiff to an intensive outpatient program (IOP) at St. Anthony's Medical Center.  (Tr. 475)  In the IOP "Admission Note" dated September 18, 2014, the therapist listed the following reasons for admission:  "Depression with anxiety evidenced by not getting out of bed, crying, panic attacks, isolating, not leaving her house and not eating."  (Tr. 491)  Plaintiff was discharged on October 10, 2014.  (Tr. 524)

Plaintiff visited Dr. Chilakamarri monthly in 2015, and he changed her medications a total of six times.  (Tr. 600, 802-09)  In January 2015, Plaintiff characterized her emotions as a "roller coaster" but reported that Klonopin was helping with panic, and Dr. Chilakamarri prescribed Brintellix.  (Tr. 809)  The next month, Plaintiff was feeling helpless, unhappy, and slow.  (Tr. 808)  Dr. Chilakamarri stopped Plaintiff's Brintellix, prescribed Fetzima, and decreased her Paxil.  (Id.)  Dr. Chilakamarri increased Plaintiff's Fetzima in March because Plaintiff was "panicky" and fatigued.  (Tr. 807)  When Plaintiff remained sad and tearful in April, Dr. Chilakamarri added Latuda and Pristiq, increased Plaintiff's Xanax, continued Paxil, and stopped her Adderall and Klonopin.  (Tr. 806)  Plaintiff was "doing well" in June, but  reported sleeping too much in August, and was depressed in September, when Dr. Chilakamarri increased her Xanax and Lamictal.  (Tr. 803-05)

At  Dr. Chilakamarri's recommendation, Plaintiff reentered the IOP at St. Anthony's Medical Center on December 7, 2015.  (Tr. 585)  Upon admission, Plaintiff reported suicidal thoughts and rated her depression at 8/10 and her anxiety 10/10, with two to three panic attacks per day.  (Id.)  Dr. Chilakamarri discontinued Plaintiff's Lamictal and prescribed Depakote the same day.  (Tr. 589)  IOP staff discharged Plaintiff on December 30, 2015.  (Tr. 591)

In mid-February 2016, Plaintiff informed Dr. Chilakamarri that she was depressed and sad with decreased appetite and poor sleep.  (Tr. 801)  Dr. Chilakamarri noted that Plaintiff was "coping poorly," recommended dialectical behavioral therapy (DBT), and prescribed Vyanse. (Id.)  One week later, on February 23, 2016, Plaintiff began a "DBT IOP" at St. Anthony's Medical Center.  (Tr. 665)  At her intake assessment, the social worker noted that Plaintiff "is flat talking very softly."  (Id.)  Plaintiff reported "low mood, poor concentration, psychomotor retardation," "crying spells, feelings of guilt and some worthlessness," irritability, and "she is also very anxious with panic attacks 3-4 times per week."  (Id.)  Plaintiff's condition improved during the IOP, and she was discharged on April 25, 2016.  (Tr. 787)

In May 2016, Plaintiff informed Dr. Chilakamarri that "[i]n my depression I didn't pay bill" and her water was "shut down."  (Tr. 800)  Dr. Chilakamarri's treatment notes from June, July, August, and November 2016 suggested that Plaintiff's conditions were stable.  (Tr. 794, 797, 799).

After approximately three months without treatment, Plaintiff returned to Dr. Chilakamarri's office in March 2017 and reported:  "November and December I have been busy with son and his college.  I have been back in bed in January and February."  (Tr. 968)  Plaintiff agreed that she should "go back to" therapy[9], and  Dr. Chilakamarri prescribed Rexulti.  (Id.)  The following month, Plaintiff was taking propranolol for anxiety and was able to "sing[] in the church in front of congregation of 60 people," but doing so gave her diarrhea.  (Tr. 970)  Dr. Chilakamarri advised Plaintiff to begin decreasing her Depakote dosage.  (Id.)

---

[9] Despite Dr. Chilakamarri repeatedly advising Plaintiff to resume therapy, Plaintiff did not do so.

12

In June 2017, Plaintiff informed Dr. Chilakamarri that she had been feeling better with the Rexulti and agreed to resume counseling.  (Tr. 973)  In September 2016, Plaintiff was feeling "okay today," but she had been "kinda in a funk" since the death of a close family friend.  (Tr. 977)  In September and November 2017, Plaintiff's medications were working well, she was not experiencing any side effects, and she again agreed to resume counseling.  (Tr. 977, 982)

When Plaintiff returned to Dr. Chilakamarri's office in January 2018, she reported that her husband was out of town and she was feeling anxious.  (Tr. 982)  In February, Plaintiff informed Dr. Chilakamarri that she "has been feeling sad this past month" and was "not motivated and fe[lt] anxious all the time."  (Id.)  Dr. Chilakamarri and Plaintiff discussed other treatment options, such as cognitive behavioral therapy and an IOP, but Plaintiff "showed no interest in talk therapy."  (Id.) The following month, Plaintiff complained of side effects from her medications, poor sleep, lack of energy, and decreased appetite.  (Id.)

In April 2018, Plaintiff presented to Dr. Chilakamarri's office with her husband.  (Id.) Plaintiff informed Dr. Chilakmarri that she was sleeping well but "last month was terrible" and she "is worried about her health and [] anxious all the time."  (Id.)  Dr. Chilakamarri noted during the visit that Plaintiff was "sitting in the office chair on the edge and swinging back and forth." (Id.)  Dr. Chilakamarri informed Plaintiff and her husband about alternatives to medications, such as transcranial magnetic stimulation (TMS)[10], electroconvulsive therapy (ECT), or vagus nerve stimulus, but Plaintiff decided she "would rather do more medication trials now."  (Id.)

At the April appointment, Dr. Chilakamarri completed a review of Plaintiff's symptoms, noting:  decreased energy; unexplained body aches; rumination; excessive mood fluctuations;

---

[10] According to Plaintiff's brief, TMS "is a noninvasive form of brain stimulation that applies powerful magnetic fields to specific areas of the braid that we know are involved in depression." [ECF No. 14 at 5]

13

distractibility; racing thoughts; short-term memory problems; and generalized anxiety "in public/crowded places, [s]ituational, [w]ith agoraphobia." (Tr. 983)   On examination, Dr. Chilakamarri observed: "tense" posture; soft speech; neutral, depressed, anxious mood; slow recall; and normal behavior, eye contact, intellect, insight, and judgment. (Tr. 984-85)   In regard to Plaintiff's medications, Dr. Chilakamarri:  restarted Seroquel and Paxil; stopped Depakote, Vyanse, and Rexulti; continued Xanax; and planned to begin BuSpar the following month. (Tr. 985)

In May 2018, Dr. Curry assessed Plaintiff's eligibility for TMS. (Tr. 1067-70)  Dr. Curry noted that Plaintiff suffered "treatment-refractory depression," which "has waxed and waned over the years, but she has not been able to achieve a full remission since the initial onset of illness." (Tr. 1067)  Plaintiff reported that her "current depressive episode has been more severe over the last 5 months," she "doesn't shower, keep house, has no activities or interest," and she experienced: "pervasive anhedonia," "pervasive low mood," "negativistic rumination, anergia, low self-esteem, difficulty making decisions, "sense of being a burden, excessive guilt," "passive thoughts of death are chronic," and "suicidal ideation frequent." (Tr. 1067-68)  Plaintiff's husband described Plaintiff as "very reclusive" and explained that "when they travel for vacations, 'she even spends most of the day in the house when we're there,' not joining in family activities." (Tr. 1068)  On examination, Dr. Curry observed:  "[g]eneral demeanor withdrawn, episodically quietly tearful"; "blunted" facial expressions; affect "[s]table, blunted to flat, severely dysphoric, anxious"; thought process and content normal; concentration "moderately to severely impaired"; attention and memory "fully intact";  and "good" verbal fluency and insight/judgment. (Tr. 1069)  Dr. Curry determined that Plaintiff was a "good candidate" for TMS and planned to begin treatments the next week. (Tr. 1070)

14

Later that month, Dr. Chilakamarri completed a checklist form medical source statement (MSS) for Plaintiff.  (Tr. 990-92)  Dr. Chilakamarri opined that Plaintiff had "extreme"[11] limitations in her ability to:  initiate and complete tasks in a timely manner; ignore or avoid distraction; sustain ordinary routine and regular attendance; use reason and judgment to make work-related decisions; understand and learn terms and/or instructions; work a full day without needing more than the allotted number or length of rest periods; distinguish between acceptable and unacceptable work performance; regulate emotions, control behavior and maintain wellbeing in a work setting; keep social interactions free of excessive irritability, argumentativeness, sensitivity or suspicion; and respond appropriately to requests, criticism, suggestions, correction and challenges.  (Tr. 990-91)  According to Dr. Chilakamarri's MSS, Plaintiff had "marked"[12] limitations in her ability to:  follow one- or two-step oral instructions to carry out a task; function independently; ask simple questions or request help.  (Tr. 991) Dr. Chilakamarri estimated that Plaintiff would miss work and leave work early "three times a month or more" due to psychologically-based symptoms and, if required to perform simple tasks full time in a low-stress environment, her overall pace of production would be "31% or more below average."  (Tr. 990) Nevertheless, Dr. Chilikamarri opined that Plaintiff "could perform in a setting where contact with the general public is  only casual and infrequent."  (Tr. 992)

Plaintiff received TMS treatments on June 12, 13, 15, 18, 19, and 21, 2018.  (Tr. 1055-65) On June 18, Plaintiff informed the doctor that her "weekend was very anxious" and she "thinks

---

[11] The MSS form defined "extreme" to mean "[n]ot able to function in this area independently, appropriately, effectively, and on a sustained basis."  (Tr. 990)

[12] "Marked" limitation meant that "[f]unctioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  (Tr. 990)

the anxiety is due to having to leave the house for [treatment] every day." (Tr. 1059)  Plaintiff cancelled her appointments on June 14 and  20, citing migraines. (Tr. 1056, 1062)

In her October 2018 decision, the ALJ reviewed and weighed Dr. Chilakamarri's MSS and assigned it "little weight." (Tr. 20)  The ALJ explained:  "The objective evidence does not support a finding of 'extreme' mental limitations and Dr. Chilakamarri stated the claimant is capable of performing 'in a setting where contact with the general public is casual and infrequent."  (Id.)  In support of her decision to give Dr. Chilakamarri's decision little weight, the ALJ noted that Plaintiff "sometimes labeled the claimant's depression as 'moderate' and at other times, her depression was labeled as 'severe.'"  (Id.)  The ALJ also pointed to Plaintiff's one-time GAF score of 75, "which is indicative of no more than mild to moderate limitations on her overall function.[13] (Id.)  The ALJ concluded:  "While the claimant's mental condition may prevent her from returning to work as a teacher due to her social anxiety, nothing convincing exists in the record to support a finding she is incapable of performing less demanding work."  (Id.)

Considering the factors set forth in 20 C.F.R. § 404.1527(c), the Court notes that Dr. Chilakamarri, a psychiatrist, treated Plaintiff's depression and anxiety for approximately twenty years.  Between 2014 and 2018, Dr. Chilakamarri generally saw Plaintiff once a month.  While Dr. Chilakamarri did not include support for his opinion in the MSS itself, his opinion as to the severity of the symptoms was consistent with Plaintiff's IOP admission notes in 2014, 2015, and 2016, as well as Dr. Curry's pre-TMS assessment of Plaintiff in 2018.  Dr. Chilakamarri prescribed

---

[13] The ALJ also referenced "the analysis and other evidence in the record [that] was already addressed in" the April 2017 decision.  (Tr. 20)  However, the April 2017 analysis of Dr. Chilakamarri's opinion was essentially the same as in the October 2018 decision.  In the earlier decision, the ALJ noted that Dr. Chilakamarri "sometimes labeled [Plaintiff's] depression as 'moderate,' while at other times he labeled her depression as 'severe,' but his only [GAF] score, made in August 2016, shows a score of 75," which "denotes that symptoms, if any, are transient and expected reactions to psychosocial stressors[.]"  (Tr. 107)

16

numerous medications, adjusted them throughout the course of treatment, and referred Plaintiff to three IOPs, from which Plaintiff obtained only short-term relief.  After an extended period of severe depression in early 2018, Dr. Chilakamarri recommended Plaintiff consider more extreme treatments, such as TMS or ECT, because medications were not controlling her symptoms.  Upon consideration of the § 404.1527(c) factors, Dr. Chilakamarri's opinion, while not necessarily entitled to controlling weight, would appear to be entitled to more than minimal weight.  See, e.g., Santiago v. Saul, No. 4:19-CV-01 CDP, 2020 WL 1083573, at *7 (E.D. Mo. Mar. 5, 2020).

The Commissioner asserts that substantial evidence supported the ALJ's decision to discount Dr. Chilakamarri's opinion because Plaintiff's activities of daily living were inconsistent with the extreme limitations Dr. Chilakamarri placed on Plaintiff's mental functioning.  In support of his position, the Commissioner relies primarily on an October 2014 function report.  In the report, Plaintiff listed various self-care, household, and recreational activities she performed, but she qualified that she undertook those activities when she was "not asymptomatic."  (Tr. 292-99) For example, Plaintiff stated:  "I do the cleaning, laundry, bills, make appointments, ironing, pull weeds, dishes if I am not symptomatic…. During symptoms I don't do any housework and let tasks pile up.  There have been weeks of depression when I am unable to do any household tasks…." (Tr. 294, 299)  Plaintiff also reported that she read, solved puzzled, and watched movies,  but she added that she engaged in these activities "when I am not symptomatic.  If depressed or anxious I isolate myself in bedroom."  (Tr. 296)  Reading Plaintiff's self-reported activities of daily living in context, they do not appear to undermine Dr. Chilakamarri's opinion.

In reviewing the ALJ's analysis of Dr. Chilakamarri's opinion, the Court is "particularly influenced by the Eighth Circuit's recent decision" in Lucus v. Saul, 960 F.3d at 1068-70.  Smith v. Saul, No. 1:20-CV-27 JAR, 2021 WL 22592, at *4-5 (E.D. Mo. Jan. 4, 2021).  The Eighth

Circuit reversed the district court and remanded because the ALJ failed to give good reasons for giving a treating psychiatrist's opinion partial weight as required by § 404.1527(c)(2).[14]  Lucas, 960 F.3d at 1069.

Here, the ALJ provided one reason for discounting Dr. Chilakamarri's opinion – namely, that it was inconsistent with objective findings contained in his treatment notes.  (Tr. 20)   In support of this finding, the ALJ cited as examples that Dr. Chilakamarri:  (1) variously characterized Plaintiff's depression as "moderate" and "severe"; and (2) assigned Plaintiff a GAF score of 75 in August 2016.  However, it is not immediately apparent that these objective findings are "inconsistent" with Dr. Chilakamarri's MSS as they do not directly relate to Plaintiff's functional abilities.  See, e.g., Mary F. v. Saul, No. 20-CV-111-DSD-KMM, 2021 WL 212328, at *6-7 (D. Minn. Jan. 4, 2021).   Furthermore, as the ALJ properly acknowledged, Plaintiff's depression "was treatment-resistant and had a tendency to wax and wane over the years[.]"  (Tr. 19-20)  "[B]ecause 'it is extremely difficult to predict the course of mental illness,' it is [ ] not appropriate to discount [a treating physician's] opinions by taking a myopic view of certain records over others."  Norwood v. Saul, No. 4:18-CV-01104-SNLJ, 2019 WL 4221524, at *5 (E.D. Mo. Sept. 5, 2019) (quoting Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996)).

Finally, the ALJ did not mention the lengthy treatment relationship between Plaintiff and Dr. Chilakamarri or the frequency of their visits, factors which should have entitled Dr. Chilakamarri's opinion to additional weight.  See, e.g., Lucus, 960 F.3d at 1069; Smith, 2021 WL 22592, at *4-5; Mary F., 2021 WL 212328, at *7.  Nor did the ALJ discuss the significance of Dr. Chiliakamarri's frequent adjustments to Plaintiff's psychotropic medications, three referrals of

---

[14] In that case, the ALJ:  (1) stated the psychiatrist's opinion was internally inconsistent without identifying a specific inconsistency; and (2) mentioned § 404.1527, but "either ignored or failed to discuss facts highly relevant to the factors listed therein."  Lucus, 960 F.3d at 1069.

Plaintiff to IOPs, and recommendation that Plaintiff undergo TMS, all of which supported Dr. Chilakamarri's opinion regarding the limiting effects of Plaintiff's impairments.   The Court therefore finds that the ALJ's analysis of Dr. Chilakamarri's opinion falls short of what is required by the regulations and case law, necessitating a remand.  See, e.g., Reed v. Saul, 481 F.Supp.3d 877, 885 (D. Minn. 2020).

C.  Some medical evidence

Plaintiff also argues that the ALJ erred in formulating an RFC that was not supported by "some medical evidence," but rather was based "upon the ALJ's own interpretation of the medical findings."  [ECF No. 14 at 6]  The Commissioner counters that the ALJ properly considered the entire record when determining Plaintiff's RFC.  [ECF No. 17]

RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations.  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 404.1545(a)(1).   An ALJ determines a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, "a claimant's residual functional capacity is a medical question."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619

(8th Cir. 2007)).   "An administrative law judge may not draw upon his own inferences from

medical reports."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

In addition to Dr. Chilakamarri's MSS, the record contained the December 2014 opinion

of state agency psychological consultant, Dr. Akeson.  (Tr. 93-97)  In December 2014, Dr. Akeson,

reviewed Plaintiff's application and medical records and completed a psychiatric review technique

and mental RFC assessment.  (Tr. 95-97)  Dr. Akeson opined that Plaintiff was "moderately

limited" in her ability to:  understand and remember very short and simple instructions; carry out

detailed instructions; work in coordination with or in proximity to others without being distracted

by them; interact appropriately with the general public; and get along with coworkers or peers

without distracting them or exhibiting behavioral extremes.  (Id.)  Dr. Akeson found that Plaintiff

was "not significantly limited" in all other areas of mental functioning, and he concluded that

Plaintiff had the RFC to "perform simple tasks on a sustained basis away from public contact."

(Tr. 97)

In her decision, the ALJ reviewed and discussed Dr. Akeson's opinion.  (Tr. 16)  She gave

"significant weight" to Dr. Akeson's opinion that Plaintiff was capable of working "on a sustained

basis away from public contact," but "little weight" to his opinion that Plaintiff was limited to

simple tasks.  (Tr. 16)

Consequently, the ALJ discounted the only two medical opinions in the record to the extent

that they found that Plaintiff's impairments limited her abilities to understand/remember/apply

information and concentrate/persist/maintain pace.  With little weight given to Dr. Chilakamarri's

and Dr. Akeson's regarding Plaintiff's functional limitations in those two areas of mental

functioning, it is unclear what medical evidence the ALJ relied on to determine Plaintiff's mental

RFC.  See Santiago, 2020 WL 1083573, at * 7 (citing Lauer v. Apfel, 245 F.3d 700, 705-06 (8th

Cir. 2011).  Based on the record as a whole, the Court finds that the ALJ's RFC determination was not supported by "some medical evidence" addressing Plaintiff's ability to function in the workplace.

**VI.    Conclusion**

For the reasons stated above, the Court finds that substantial evidence in the record as a whole does not support the Commissioner's decision that Plaintiff was not disabled.  Accordingly,

**IT IS HEREBY ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

An order of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of March, 2021